## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| SCOTT FISCHER, On Behalf of Himself and All Others Similarly Situated,<br><br>    Plaintiff,<br><br>  v.<br><br>INTERACTIVE INTELLIGENCE GROUP, INC., DONALD E. BROWN, MITCHELL E. DANIELS, EDWARD L. HAMBURG, MICHAEL C. HEIM, MARK E. HILL, and RICHARD A. RECK,<br><br>    Defendants. | Case No.  1:16-cv-02666<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Scott Fischer ("Plaintiff") by his undersigned attorneys, for this Class Action Complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This action is brought as a class action on behalf of the public stockholders of Interactive Intelligence Group, Inc. ("Interactive Intelligence" or the "Company") against the Company's Board of Directors (the "Board" or the "Individual Defendants"), as a result of their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").  In connection with a proposed

1

transaction announced on August 31, 2016 (the "Proposed Transaction"), pursuant to which Interactive Intelligence will be acquired by Genesys Telecommunications Laboratories, Inc. ("Parent") and Parent's wholly-owned subsidiary, Giant Merger Sub Inc. ("Merger Sub," and together with Parent, "Genesys").

2.      On August 30, 2016, the Board caused Interactive Intelligence to enter into an agreement and plan of merger (the "Merger Agreement").  Pursuant to the terms of the Merger Agreement, stockholders of Interactive Intelligence will receive $60.50 in cash for each share of Interactive common stock.

3.      The Proposed Transaction is the product of a flawed process and deprives Interactive Intelligence's public stockholders of the ability to participate in the Company's long-term prospects.

4.      Compounding the unfairness of the Proposed Transaction, defendants issued materially incomplete and misleading disclosures in the Schedule 14A Preliminary Proxy Statement (the "Proxy") filed with the United States Securities and Exchange Commission ("SEC") on September 20, 2016.  The Registration Statement is deficient and misleading in that it fails to provide adequate disclosure of all material information related to the Proposed Transaction.

5.      Plaintiff seeks enjoinment of the Proposed Transaction or, alternatively, rescission of the Proposed Transaction in the event defendants are able to consummate it.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and Section 20(a) of the Exchange Act.  The Court may exercise supplemental jurisdiction, in accordance with 28 U.S.C. § 1367, over Plaintiff's state-law claims.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

7.     Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.  The Individual Defendants have also agreed to submit to the jurisdiction of this Court pursuant to new Section 9.8 of the Company's Bylaws, which was approved as an additional amendment with the Merger Agreement, and which designates this Court as the sole and exclusive federal forum for adjudication of actions of this nature.

8.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Interactive is incorporated in this District; (iii) a substantial portion of the transactions and wrongs complained of

herein, including defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District. Venue is also proper in this District pursuant to new Section 9.8 of the Company's Bylaws, which designates this District as the sole and exclusive federal forum for adjudication of actions of this nature.

## PARTIES

9.     Plaintiff Scott Fischer has been continuously throughout all times relevant hereto, the owner of Interactive Intelligence common stock. Scott Fischer is a citizen of Ellicott City, Maryland, United States.

10.     Defendant Interactive Intelligence is an Indiana corporation and maintains its principal executive offices at 7601 Interactive Way, Indianapolis, Indiana. The Company provides unified business communications solutions for call centers, enterprise IP telephony, and business process automation. Interactive Intelligence's common stock is traded on the New York Stock Exchange under the ticker symbol "ININ."

11.     Defendant Donald E. Brown ("Brown") co-founded Interactive Intelligence in October 1994 and has served as President since its inception, Chief Executive Officer ("CEO") since April 1995, Chairman of the Board since July 1998, and a director since its inception.

12.     Defendant Mitchell E. Daniels ("Daniels") has served as a director of Interactive Intelligence since 2015. According to the Company's website, Daniels is a member of the Compensation and Stock Option Committee.

13.     Defendant Edward L. Hamburg ("Hamburg") has served as a director of Interactive Intelligence since 2004. According to the Company's website, Hamburg is Chair of the Audit Committee and a member of the Nominating and Corporate Governance Committee.

14.     Defendant Michael C. Heim ("Heim") has served as a director of Interactive Intelligence since 2007. According to the Company's website, Heim is a member of the Audit Committee and Nominating and Corporate Governance Committee.

15.     Defendant Mark E. Hill ("Hill") has served as a director of the Interactive Intelligence since 2004. According to the Company's website, Hill is Chair of the Compensation and Stock Option Committee and Chair of the Nominating and Corporate Governance Committee.

16.     Defendant Richard A. Reck ("Reck") has served as a director of the Interactive Intelligence since 2005. According to the Company's website, Reck is a member of the Audit Committee and the Compensation and Stock Option Committee.

17.     The defendants identified in paragraphs 11 through 16 are collectively referred to herein as the "Individual Defendants." By virtue of their positions as directors and/or officers of Interactive Intelligence, the Individual Defendants are in

a fiduciary relationship with Plaintiff and the other public stockholders of Interactive Intelligence.

18.     Each of the Individual Defendants at all relevant times had the power to control and direct Interactive Intelligence to engage in the misconduct alleged herein.  The Individual Defendants' fiduciary obligations required them to act in the best interest of Plaintiff and all Interactive Intelligence stockholders.

19.     Each of the Individual Defendants owes fiduciary duties of loyalty, good faith, due care, and full and fair disclosure to Plaintiff and the other members of the Class.  The Individual Defendants are acting in concert with one another in violating their fiduciary duties as alleged herein, and, specifically, in connection with the Proposed Transaction.

20.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are continuing to violate, the fiduciary duties they owe to Plaintiff and the Company's other public stockholders, due to the fact that they have engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

21.     Parent is a California corporation with its corporate headquarters located at 1155 Market Street, 11th Floor, San Francisco, California.

22.     Merger Sub is an Indiana corporation and a wholly-owned subsidiary of Parent.  Merger Sub is a shell corporation that was created solely for purposes of effectuating the Proposed Transaction, and does not maintain a principal place of business.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings Counts I and II as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the other public stockholders of Interactive Intelligence (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

24.     This action is properly maintainable as a class action.

25.     The Class is so numerous that joinder of all members is impracticable. As of August 26, 2016, there were approximately 22,268,205 shares of Interactive Intelligence common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

26.     Questions of law and fact are common to the Class, including, among others: (i) whether defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy; and (ii) whether defendants will irreparably harm Plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

27.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

28.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

29.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### *Background of the Company*

30.     Interactive Intelligence is a software company founded in 1994 and provides unified business communications solutions for call centers, enterprise IP telephony, and business process automation.  The Company partners with other telecommunications companies, such as HP, IBM, Microsoft, Polycom and Salesforce.com, and specializes in the verticals of financial services, outsourced and teleservices, insurance, and accounts receivables management.

31.     On March 10, 2016, Interactive Intelligence issued a press release announcing that it had won Cloud Computing magazine's 2015 Product of the Year Award for PureCloud Engage.  Cloud Computing magazine's Product of the Year Award honors vendors with the most innovative, useful, and beneficial cloud products and services.  PureCloud Engage is an omnichannel customer engagement cloud service that helps contact centers accelerate business impact, deliver consistent

8

outcomes, and innovate the customer and agent experience.  Jeff Platon, Interactive Intelligence CMO, commented:

> We built PureCloud Engage℠ to get customers up and running in days or weeks instead of months. . . . To help customers stay competitive, we also made sure that it could deliver value faster through a continuous development process that offers new functionality weekly. We also got rid of long-term contracts. Customers can go month-to-month with absolutely no strings attached. This makes PureCloud Engage℠ an extremely low-risk proposition with the potential for dramatic business impact.

32.    PureCloud's success only continued.   On April 13, 2016, Interactive Intelligence issued a press release announcing that it had received Frost & Sullivan's 2016 North American Cloud Contact Center Visionary Innovation Leadership Award, based on the visionary innovation and performance of its PureCloud.  The Visionary Innovation Leadership Award is given to a single vendor based on how it performs against key competitors in company culture, vision alignment, technological sophistication, a focus on unmet needs, growth performance, and growth pipeline. According to the report, "Interactive Intelligence has produced a winner with the strategy behind the design of PureCloud. Its rapid scalability, flexibility, ease of use, and affordability address key needs in the market. With its strong overall performance and potential to increase its market presence with PureCloud, Interactive Intelligence has earned Frost & Sullivan's 2016 Visionary Innovation Leadership Award for Cloud Contact Centers."

33.    The Company is positioned for future growth and success.  For example, on May 2, 2016, the Company issued a press release announcing its first quarter 2016 results.  Among other things, the Company reported that it signed 118 PureCloud

customers, almost five times as much as the previous quarter. The Company also reported revenues of $99.3 million, an increase of 11 percent from $89.5 million in the first quarter of 2015. Recurring revenues increased 19% to $64.3 million, which included cloud subscriptions and support fees from on-premises licenses, and account for 65 percent of the total revenues. Revenues from cloud subscriptions grew 41 percent to $29.7 million, compared to $21.0 million in the same quarter the year prior. License and hardware revenues were $21.4 million and services revenues were $13.6 million, compared to $21.6 million and $13.6 million, respectively, in the first quarter of 2015.

34. Not only has Interactive Intelligence had extreme success both financially and with its products, but also on a compliance level as well. On May 26, 2016, Interactive Intelligence issued a press release announcing its PureCloud and Communications as a Service (CaaS) solutions have met international compliance requirements across all its global data centers. PureCloud achieved a statement on Standards for Attestation Engagements (SSAE 16) and International Standard on Assurance Engagements (ISAE 3402) SOC2 Type II. CaaS achieved validation of its 14 global data centers by upgrading its statement on Standards for Attestation Engagements (SSAE 16) and International Standard on Assurance Engagements (ISAE 3402) SOC 2 Type II. Interactive Intelligence also updated its CaaS Payment Card Industry Data Security Standard (PCI DSS) certification to PCI-DSS 3.1 in the U.S. and European Union. Defendant Brown commented:

> With more than 20 years of experience working with global contact centers that are regularly tasked with collecting sensitive customer

data, we deeply understand strict security, compliance and privacy standards. . . . We've upgraded our compliance certifications to fully represent our global service offerings so our international customers can rest assured they're getting the safest, most trusted cloud services on the market.

***The Flawed Process Leading to the Proposed Transaction***

35.    As set forth in the Proxy, the Proposed Transaction is the result of a flawed sales process focused on a transaction with Genesys.

36.    Discussions first began in December 2011, when the Company engaged Union Square as its financial advisor.  Shortly thereafter, the Board directed Union Square to engage in strategic partnership discussions with various third parties, including Genesys.  The Board also created a special committee comprising of Defendants Hamburg, Hill, and Reck (the "Independent Committee").

37.    As part of the process, from March 2012 to May 2012, a series of preliminary meetings and discussions were held involving Interactive Intelligence, Union Square, Genesys and Permira Advisers LLC ("Permira"), the majority owner of Genesys.  Interactive Intelligence and Genesys subsequently executed mutual non-disclosure agreements ("NDAs") on May 15, 2012, which contained a customary standstill provision.

38.    On June 19, 2012, Genesys submitted a preliminary indication of interest to acquire Interactive Intelligence for $38.00 per share.  The Board, in light of Interactive Intelligence's standalone prospects at the time, decided to reject the offer in favor of continuing to operate as an independent publicly traded company.

39.    On February 2, 2015, Interactive Intelligence entered into a new engagement with Union Square to act as its financial advisor for another three-year term.

40.    On May 5, 2015, Paul Segre ("Segre"), the CEO of Genesys, called Defendant Brown to discuss the merits of the merger.  One month later on June 4, 2015, Segre and Defendant Brown conversed regarding a potential sale of Interactive Intelligence's Communications as a Service ("Caas") and Customer Interaction Center ("CIC") business.  However, on June 18, 2015, Defendant Brown wrote an email to Segre rejecting the idea of splitting the business.

41.    On November 8, 2015, Genesys sent Defendant Brown an unsolicited indication of interest to acquire the Company for $47.00 per share.  However, the Board decided it was not in the best interest of Interactive Intelligence to deviate from its strategic plan at that time.

42.    In early 2016, representatives of a private equity firm ("Sponsor A") contacted Union Square to express an interest in meeting with Interactive Intelligence.  Union Square introduced Defendant Brown to representatives of Sponsor A on April 26, 2016. Defendant Brown and the President of Sponsor A met on May 9, 2016 to discuss, among other things, general information about Interactive Intelligence and the contact center software market, but specific transaction terms were not discussed.

43.    On May 3, 2016, Union Square had an informational discussion with representatives of Permira regarding, among other things, the possibility of a sale of

Interactive Intelligence's CIC business.   Permira also raised the possibility of executing a new NDA to facilitate discussions with Interactive Intelligence.  On May 18, 2016, Segre called Defendant Brown to discuss the communications between Union Square and Permira regarding splitting the Interactive Intelligence business.

44.   On May 19, 2016, the Board held a regularly scheduled meeting during which Defendant Brown reported the recent outreach by Sponsor A and Permira.  The Board requested that Union Square prepare a presentation for a future board meeting detailing key considerations for a formal market outreach process to better inform its decision making, as well as to identify the most likely interested parties and provide perspective regarding the potential value of Interactive Intelligence.

45.   The Board then held a special meeting on June 6, 2016, during which Union Square presented its perspectives.  The Board then directed Union Square to work toward a formal sale process and to solicit indications of interest from an initial list of potential interested parties, proposed by Union Square and then discussed with the Board.  The Board also authorized the Independent Committee to again act as a special committee to oversee the process.

46.   On or about June 14, 2016, at the direction of the Board, Union Square began its marketing efforts by contacting fifteen potential interested parties, nine strategic parties and six financial sponsors, sending each the teaser and a form NDA which included customary "standstill" provisions. In the following weeks, NDAs were executed with seven parties, including Genesys and six financial sponsors, which

were Sponsor A, Hellman & Friedman ("H&F"), and four additional private equity firms, hereinafter referred to as Sponsor B, Sponsor C, Sponsor D, and Sponsor E.

47.     On June 27, 2016, Sponsor A contacted the Company and requested to partner with Sponsor F to jointly evaluate the opportunity.  Management then held meetings between June 23, 2016 and July 6, 2016 with Sponsor A and Sponsor F together, with each of Sponsor B, Sponsor C, Sponsor D and H&F, and with Genesys and Permira together.  Between June 28, 2016 and July 1, 2016, each of these parties was also provided initial access to a virtual data room.

48.     On July 1, 2016, Sponsor E informed Union Square that it was not interested in participating further in the process.

49.     On July 5, 2016, Union square sent first round process letters to Sponsor A and Sponsor F, Sponsor B, Sponsor C, Sponsor D, H&F, and Genesys and Permira requesting they submit preliminary indications of interest by July 18, 2016, with an offer price of at least $60.00 per share.

50.     On July 19, 2016, Genesys submitted a preliminary indication of interest to acquire the Company for $62.00 per share.  Genesys was the only party to submit a preliminary indication of interest.

51.     By July 20, 2016, Sponsors A and F, Sponsor B, Sponsor C, Sponsor D and Sponsor E each determined they would not submit an indication of interest because their respective evaluations were below the Company's minimum expectation of $60.00 per share.  Additionally, the five strategic parties who had not

yet signed NDAs indicated they would not be interested in pursuing an acquisition of the Company.

52.    At a Board meeting on July 20, 2016, the Board directed Union Square to continue the process and to invite Genesys to participate in the next round.  The Board also directed Union Square to engage with the other potential interested parties, including H&F, to determine if there was any renewed interest in submitting an indication of interest.

53.    On July 21, 2016, H&F publicly announced that it had executed a transaction agreement to invest approximately $900 million in Genesys and become a minority investor in Genesys, alongside Permira as a continuing investor.  The Board agreed to grant the request.

54.    On July 22, 2016, Genesys, Permira, H&F and their respective advisors were granted access to additional due diligence and the virtual data room.  Then on July 29, 2016, they provided the Company with a proposed draft of a merger agreement.

55.    On July 29, 2016, a Reuters news report was released indicating that Interactive Intelligence was exploring strategic alternatives, including a potential sale.  After this news report, Union Square received unsolicited inquiries from several other potential interested parties, all of which were financial sponsors.  However, it was determined that several of these parties lacked the capacity to successfully complete a transaction.

56.     However, two of the private equity firms (referred to hereinafter as Sponsor G and Sponsor H), were considered potentially credible interested parties. Union Square discussed the process with principals from both firms, and subsequently Sponsor G decided not to participate in the process, and Sponsor H executed an NDA on August 2, 2016, but then ultimately decided not to participate further in the process.

57.     On August 8, 2016, Segre called Defendant Brown to communicate key areas of due diligence, and indicated that they would not be able to meet the Company's previously communicated deadline of August 8, 2016, to submit a final proposal. The Company then extended the deadline to August 18, 2016.

58.     Genesys then submitted a final proposal on August 20, 2016, to acquire the Company for $60.00 per share.

59.     On August 21, 2016, the Independent Committee of Board held a meeting with representatives of Union Square and FaegreBD to review the final proposal submitted by Genesys and to discuss certain key issues presented by Genesys' proposal. The Board then held a regularly scheduled meeting on August 23 and August 24, 2016, during which the Independent Committee met to further discuss Genesys' proposal, ultimately instructing Union Square to reject the $60.00 proposal and to request that Genesys submit a higher proposal.

60.     On August 25, 2016 a representative of Union Square met with a representative of Permira, at which time Union Square conveyed the Independent Committee's response to the $60.00 proposal.

16

61.   On August 25, 2016, representatives of Permira and H&F called representatives of Union Square and orally committed to increasing their proposed price from $60.00 per share to $60.50 per share.   On August 26, 2016, the Independent Committee, joined by representatives of FaegreBD and Union Square, had a telephonic meeting at which certain material issues in the markup of the draft merger agreement, disclosure schedules and voting agreement with Defendant Brown were reviewed and discussed.

62.   On the evening of August 30, 2016, the Board held a meeting to review the final terms of the Merger Agreement and to consider the merger, with representatives from FaegreBD and Union Square in attendance.   During this meeting, the Independent Committee unanimously determined the Merger Agreement was fair and in the best interests of the Company's shareholders, and recommended the Board approve and adopt the Merger Agreement.   Following this recommendation, the Board unanimously determined that the entry by Interactive Intelligence into the Merger Agreement.

63.   On August 31, 2016, the relevant parties executed the Merger Agreement and the Voting Agreement.   That same day, the Company and Genesys issued a joint press release announcing the transaction.

**_The Inadequate Proposed Transaction and Deal Protection Provisions_**

64.   Despite the Company's prospects for future growth and success, the Board caused the Company to enter into the Merger Agreement for inadequate consideration.

65.     To the detriment of the Company's stockholders, the terms of the Merger Agreement substantially favor Genesys and are calculated to unreasonably dissuade potential suitors from making competing offers.

66.     Indeed, despite the fact that they conducted a flawed sales process prior to signing the Merger Agreement, the Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "No Solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Section 5.3(a) of the Merger Agreement states:

> (a) Subject to the provisions of this <u>Section 5.3</u>, from the date hereof until the earlier of the Effective Time and the Termination Date, the Company agrees that it shall not, and shall cause its Subsidiaries not to, and shall use its reasonable best efforts to cause its Affiliates and Representatives not to, directly or indirectly, (i) solicit, initiate, cooperate with, knowingly facilitate or knowingly induce the making of any submission or announcement of an Alternative Proposal or the making of any inquiry, offer or proposal that would reasonably be expected to lead to any Alternative Proposal, (ii) participate or engage in any discussions or negotiations regarding an Alternative Proposal with, or furnish any nonpublic information regarding an Alternative Proposal to, any Person that has made or, to the Knowledge of the Company, is considering making an Alternative Proposal (except, in each case, solely to notify such Person of the existence of the provisions of this <u>Section 5.3</u>), (iii) approve, endorse or recommend an Alternative Proposal, (iv) terminate, amend, release, modify or fail to enforce any provision of, or grant any permission, waiver or request under, any confidentiality agreement entered into by the Company in respect of or in contemplation of an Alternative Proposal, (v) take any action to make the provisions of any takeover laws inapplicable to any Alternative Proposal, (vi) enter into any letter of intent or agreement in principle or any agreement providing for any Alternative Proposal (except for

confidentiality agreements permitted under <u>Section 5.3(b)</u>) or (vii) publicly propose to do any of the foregoing.

67.     Further, pursuant to Section 5.3(b) of the Merger Agreement, the Company must advise Genesys, within twenty-four hours, of any proposals or inquiries received from other parties, including, *inter alia*, the material terms and conditions of the proposal and the identity of the party making the proposal.  Section 5.3(b) of the Merger Agreement states:

> (b) Notwithstanding anything in this <u>Section 5.3</u> to the contrary, at any time prior to obtaining the Company Shareholder Approval, if the Company receives an Alternative Proposal that was not solicited in violation of <u>Section 5.3(a)</u> and that either constitutes, or that the Board of Directors of the Company determines in good faith after consultation with outside legal and financial advisors would reasonably be expected to result in, a Superior Proposal, the Company may take the following actions: (x) furnish nonpublic information to the third party making such Alternative Proposal, if, prior to so furnishing such information, the third party has entered into an executed confidentiality agreement with the Company having provisions as to confidential treatment of information that are not materially less favorable to the Company than the confidentiality provisions of the Confidentiality Agreement, and (y) engage in discussions or negotiations with the third party with respect to the Alternative Proposal; *provided* that (i) the Company shall notify Parent orally (and then in writing within twenty-four (24) hours) of any inquiry made to the Company with respect to, or which would reasonably be expected to lead to, any Alternative Proposal, the identity of the Person or group making any such Alternative Proposal, request or inquiry, the terms and conditions of such Alternative Proposal, request or inquiry, copies of all written documents, requests or inquiries relating to any Alternative Proposal (including the financing thereof), and (ii) contemporaneously with furnishing any non-public information to such third party (and/or its Representatives), the Company shall furnish or make available such non-public information to Parent or its Representatives (to the extent such information has not been previously furnished to Parent). The Company hereby acknowledges and agrees that any material violation of the restrictions set forth in this Section 5.3 by any Subsidiary of the Company or any Representative of the Company of any of its Subsidiaries shall be deemed to be a breach of this Section 5.3 by the Company.

68.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Parent a "matching right" with respect to any "Superior Proposal" made to the Company.  Sections 5.3(c) of the Merger Agreement provides:

> (c)Except as set forth in this Section 5.3, the Board of Directors of the Company shall not (i) fail to make, withdraw, qualify (or modify in any manner adverse to Parent), or propose publicly to withdraw, qualify (or modify in any manner adverse to Parent), the Recommendation, (ii) approve, recommend or declare advisable any Alternative Proposal or propose publicly to approve, recommend or declare advisable any Alternative Proposal, (iii) take any formal action or make any recommendation or public statement in connection with a tender offer or exchange offer other than a recommendation against such offer or a temporary "stop, look and listen" communication by the Board of Directors of the Company pursuant to Rule 14d-9(f) of the Exchange Act, or (iv) enter into any agreement, contract or agreement in principle requiring the Company to abandon, terminate or breach its obligations hereunder or fail to consummate the Merger (any such action, a "Change of Recommendation"). Anything to the contrary set forth in this Agreement notwithstanding, prior to obtaining the Company Shareholder Approval, the Board of Directors of the Company may, in response to a Superior Proposal received by the Company after the date of this Agreement on an unsolicited basis, (x) make a Change of Recommendation or (y) cause the Company to terminate this Agreement pursuant to Section 7.1(g) (provided that prior to or simultaneously with such termination the Company shall have entered into a definitive agreement with respect to such Superior Proposal and paid the Company Termination Fee) solely in the event that:

> (i)the Board of Directors of the Company has received a Superior Proposal after the date of this Agreement;

> (ii)the Company shall have given Parent at least five Business Days' written notice (a "Superior Proposal Notice") advising Parent of its intention to make such a Change of Recommendation or terminate this Agreement (the "Superior Proposal Notice Period"), which Superior Proposal Notice shall include all material terms and conditions of the Superior Proposal that is the basis for the proposed action of the Board

of Directors of the Company, the identity of the Person making the Superior Proposal and a copy of the most current version of the proposed definitive agreement for such Superior Proposal;

(iii) if requested by Parent, during the Superior Proposal Notice Period, the Company shall have met and negotiated with Parent regarding modifications to the terms and conditions of this Agreement so that such Superior Proposal ceases to be a Superior Proposal;

(iv) at the end of such Superior Proposal Notice Period, after taking into account any binding commitments made by Parent to amend the terms of this Agreement during the period following delivery of such Superior Proposal Notice, the Board of Directors of the Company concludes that the Superior Proposal giving rise to the Superior Proposal Notice continues to constitute a Superior Proposal; provided that (x) any material modifications to the terms of the Superior Proposal shall commence a new Superior Proposal Notice Period under clause (ii) of three Business Days; and

(v) the Board of Directors of the Company determines (after consultation with its outside legal counsel and after considering any counter-offer or proposal made by Parent pursuant to clause (iv) above), that, in light of such Superior Proposal, the failure to terminate this Agreement or effect a Change of Recommendation would reasonably be expected to be inconsistent with its fiduciary duties under applicable Law;

69. Further locking up control of the Company in favor of Genesys is Section 7.3 of the Merger Agreement, which contains a provision for a "Termination Fee" of up to $43 million, payable by the Company to Geneysis if the Individual Defendants cause the Company to terminate the Merger Agreement pursuant to the lawful exercise of their fiduciary duties.

70. Additionally, the Company further locked up the Proposed Transaction in favor of Genesys and entered into a voting agreement ("Voting Agreement") with Defendant Brown. According to the Voting Agreement, Defendant Brown has agreed

to vote his shares, which amount to approximately 17% of the Company's total shares, in favor of the Proposed Transaction.

71.     By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

72.     Moreover, certain officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.   For example, several of the Company's executive officers entered into retention agreements (the "Retention Agreements") for which they will receive extensive benefits for the termination of their employment.

73.     The consideration to be paid to Plaintiff and the Class in the Proposed Transaction is unfair and inadequate because, among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

74.     Furthermore, the Proposed Transaction consideration fails to adequately compensate the Company's stockholders for the significant synergies created by the merger.  For example, Paul Segre, CEO of Parent, has stated that,

> This is a milestone transaction that combines industry-leading expertise and capabilities to enable lasting customer relationships, accelerate innovation and drive growth. . . . Our combined product portfolio will provide the broadest set of transformative customer experience solutions optimized for customers of all sizes and sophistication levels, available both in the cloud and on-premise. We will significantly invest across the entire Interactive Intelligence product portfolio to support the continued momentum of PureCloud®, Cloud Communications-as-a-Service℠ (CaaS) and Customer Interaction Center™ (CIC), in addition to the rich portfolio of products offered by Genesys today. We are excited

22

to work with the Interactive Intelligence team to deliver even greater innovation and value to our global customers and partners.

75.     Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

76.     As a result, the stockholders will not receive adequate or fair value for their Interactive Intelligence common stock in the Proposed Transaction.

**The Materially Incomplete and Misleading Registration Statement**

77.     Defendants filed the Proxy with the SEC in connection with the Proposed Transaction on September 20, 2016.  As discussed below and elsewhere herein, the Proxy omits material information that must be disclosed to Interactive Intelligence's stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

78.     Notably, the Proxy fails to disclose certain projected financial information prepared by Interactive Intelligence management and relied upon by Union Securities.  Specifically, with respect to Interactive Intelligence's projections provided and relied upon by Union Securities, the following items should be disclosed: (i) reconciliation of GAAP net income to non-GAAP unlevered free cash flow ("UFCF") and non-GAAP EBITDA; (ii) synergies; (iii) all figures for the Wall Street projection as used by Union Securities in its fairness analysis; (iv) an explanation for "other adjustments"; and (v) an explanation for the amortization added back in the calculation of UFCF, and whether this amortization includes both capitalized software and intangibles.

79.   The omission of this information renders the following information misleading:

a.   On page 48 of the Proxy, the table below:

| | 6 Month: Ending December 31, 2016 | Calendar Year Ending December 31, | | |
|---|---|---|---|---|
| | | 2016 | 2017 | 2018 |
| | | (dollars in million) | | |
| Revenue | $ 221.9 | $ 430.0 | $ 469.6 | $ 551.5 |
| Adjusted EBITDA (non-GAAP)(1) | $ 23.4 | $ 28.0 | $ 58.8 | $ 111.7 |
| *Less:* Depreciation | $ 10.6 | $ 19.1 | $ 16.9 | $ 13.8 |
| *Less:* Amortization of Capitalized Software | $ 3.9 | $ 7.7 | $ 6.9 | $ 6.3 |
| Adjusted EBIT (non-GAAP)(2) | $ 8.9 | $ 1.2 | $ 35.0 | $ 91.6 |
| *Less:* Amortization of Intangibles | $ 1.2 | $ 3.7 | $ 2.5 | $ 2.5 |
| *Less:* Share-based Compensation | $ 9.7 | $ 18.8 | $ 20.3 | $ 22.7 |
| *Less:* Other Adjustments | $ 0.0 | $ (1.3) | $ 0.0 | $ 0.0 |
| EBIT (non-GAAP)(3) | $ (2.0) | $ (20.1) | $ 12.2 | $ 66.4 |
| Unlevered Free Cash Flow(4) | $ 8.2 | $ 7.7 | $ 26.1 | $ 72.5 |

(1)   Adjusted EBITDA is earnings before interest, taxes, depreciation and amortization and also before stock-based compensation expenses and one-time expenses.

(2)   Adjusted EBIT is earnings before interest and taxes and also before share-based compensation expenses, amortization of intangibles and one-time expenses.

(3)   EBIT is earnings before interest and taxes.

(4)   Derived as EBIT less taxes, plus depreciation and amortization, less capital expenditures, less capitalized software development costs and less increases (or plus decreases) in net working capital. To account for future share dilution to current shareholders, share-based compensation is not added back in the calculation of unlevered free cash flow.

80.   These statements are rendered false and/or misleading by the omissions identified above because without full access to the estimates of Interactive Intelligence's future cash flows, Company shareholders cannot reliably compare the intrinsic value of the Company to the proposed Merger Consideration offered by Genesys, and thus cannot determine whether the Proposed Transaction is indeed fair, as Defendants and Union Securities allege in the Proxy.  Moreover, these projections form the backbone of the DCF Analysis prepared by Union Securities in its fairness opinion.

81.   It is well-settled that management's financial projections are the lifeblood of the Company and are crucial to providing stockholders with management's inside view of the Company's value and future prospects.

Stockholders are entitled to know about the Company's promising future financial prospects before being asked to vote on the Proposed Transaction. This expected performance is more reliable than similar forecasts prepared by third-party analysts and other non-insiders as it comes from members of corporate management who have their fingers on the pulse of the company. This is particularly true when the stockholders will be cashed out of the Company, because unlike a stock transaction, the stockholders will have no participation in the success of the future combined companies. Therefore, it is important to know what management and the company's financial advisor's best estimate of those future cash flows would be. Moreover, such forecasts are material to Plaintiff and other reasonable investors because, in addition to the few line item projections disclosed in the Proxy, Union Securities reviewed and relied upon the omitted projections in preparing their fairness opinion. This data is necessary for making an informed decision about whether to support the Proposed Transaction and, thus, must be disclosed.

82.    The Proxy further omits material information with respect to the opinions and analyses of Union Securities as well as the process and events leading up to the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Interactive Intelligence's stockholders.

83.    In particular, with respect to Union Securities' *Comparable Public Company Trading Analysis*, the Proxy fails to disclose: (i) a valuation summary detailing the calculation of fully diluted shares, equity value (at the unaffected price

and the offer) and enterprise value (at the unaffected price and the offer); (ii) whether pricing multiples were calculated, and if so, what they were; (iii) the objective selection criteria and the observed company-by-company pricing multiples and financial metrics examined by Union Securities; and (iv) whether other multiples were calculated, and if so, what they were.

84.    The omission of this information renders the following information misleading:

a.   On pages 51-52 of the Proxy, the following information:

*Comparable Public Company Trading Analysis*

Union Square performed a comparable public company trading analysis, which attempts to provide an implied value of a company by comparing it to similar companies that are publicly traded. Union Square compared certain financial estimates for Interactive Intelligence with comparable publicly available consensus estimates for selected companies that share similar business characteristics or those that have similar scale and operating characteristics. These companies included the following Call Center / Collaboration, Customer Service and Workforce Management software companies:

- 8x8 Inc.
- Broadsoft Inc.
- Five9 Inc.
- LivePerson Inc.
- Mitel Networks Corp.
- Nice Ltd.
- Nuance Communications, Inc.
- Pegasystems Inc.
- RingCentral Inc.
- Shoretel Inc.
- Verint Systems Inc.
- West Corp.

For purposes of this analysis, Union Square analyzed the following statistics for each of the selected comparable companies:

- The enterprise value divided by estimated revenue for calendar year 2016, which is referred to below as Enterprise Value/2016E Revenue; and

- The enterprise value divided by estimated revenue for calendar year 2017, which is referred to below as Enterprise Value/2017E Revenue.

The following table summarizes the mean and median Enterprise Value/Revenue multiples of the selected group of comparable public companies:

| Selected Comparable Public Company Trading Statistics | Mean | Median |
|---|---|---|
| Enterprise Value/2016E Revenue | 3.0x | 2.8x |
| Enterprise Value/2017E Revenue | 2.7x | 2.6x |

Based on the analysis of the relevant metrics for each of the selected comparable companies and upon the application of its professional judgment and expertise, Union Square selected representative ranges of financial multiples and applied these ranges of financial multiples to the relevant financial statistic for Interactive Intelligence.

Based on the number of outstanding shares of Interactive Intelligence common stock on a fully diluted basis (including outstanding options and RSUs) as of July 31, 2016, Union Square calculated the estimated implied value per share of our common stock as follows:

| Financial Statistic | Selected Comparable Companies Representative Multiple Range | Implied Value Per Share of Interactive Intelligence Common Stock |
|---|---|---|
| Enterprise Value/2016E Revenue (Management Case) | 2.0x - 3.0x | $38.48 - $56.12 |
| Enterprise Value/2017E Revenue (Management Case) | 1.75x - 2.75x | $36.90 - $56.17 |
| Enterprise Value/2016E Revenue (Wall Street Case) | 2.0x - 3.0x | $38.46 - $56.10 |
| Enterprise Value/2017E Revenue (Wall Street Case) | 1.75x - 2.75x | $37.50 - $57.11 |

Union Square noted that the consideration to be received by holders of shares of Interactive Intelligence common stock (other than excluded shares) pursuant to the merger agreement was $60.50 per share.

No company utilized in the comparable public company trading analysis is identical to Interactive Intelligence. In evaluating the selected comparable companies, Union Square made judgments and assumptions with regard to industry performance, general business, economic, market and financial conditions and other matters, many of which are beyond the control of Interactive Intelligence, such as the impact of competition on Interactive Intelligence's businesses and the industry generally, industry growth and the absence of any adverse material change in Interactive Intelligence's financial condition and prospects or the industry or in the financial markets in general. Mathematical analysis (such as determining the average or median) is not in itself a meaningful method of using comparable company data.

85.   The omission of the information identified above renders this section of the Proxy materially misleading because shareholders have no way of determining whether the selected range of multiples applied by Union Securities have a valid basis and are reasonable in light of the fact they fall outside the range of multiples (or outside the median range) for the comparable companies.

86.   With respect to Union Securities' *Precedent Transactions Analysis,* the Proxy fails to disclose: (i) the objective selection criteria and the observed transaction-by-transaction enterprise values, pricing multiples and financial metrics; (ii) whether other multiples and/or transaction premiums were examined and, if so, what they were; and (iii) whether NTM data is available for all.

87.   The omission of this information renders the following information misleading:

a.   On pages 53-54 of the Proxy, the following information:

*Precedent Transactions Analysis*

Union Square performed a precedent transactions analysis, which is designed to imply a value of a company based on publicly available financial terms of selected transactions. In connection with its analysis, Union Square compared publicly available statistics for 21 selected transactions (which we refer to as the selected precedent transactions) announced since March 3, 2011, involving Customer Experience Management, Contact Center and Collaboration software companies. Union Square selected the precedent transactions because they shared certain characteristics with the merger. The following is a list of the selected precedent transactions reviewed and the month and year each transaction was announced:

| Date Announced | Acquiror | Target |
| --- | --- | --- |
| July 2016 | Hellman & Friedman LLC | Genesys Telecommunications Laboratories Inc.* |
| July 2016 | Nuance Communications, Inc. | TouchCommerce, Inc. |
| May 2016 | NICE Ltd. | InContact, Inc. |
| May 2016 | Siris Capital Group, LLC | Polycom, Inc. |
| May 2016 | Vonage Holdings Corp. | Nexmo, Inc. |
| April 2016 | Open Text Corp. | HP Inc. (CX BU) |
| January 2016 | NICE Ltd. | Nexidia Inc. |
| March 2015 | Mitel Networks Corp. | Mavenir Systems Inc. |
| January 2014 | Microsoft Dynamics Inc. | Parature Inc. |
| January 2014 | Verint Systems Inc. | Kana Software Inc. |
| November 2013 | Mitel Networks Corp. | Aastra Technologies Ltd. |
| July 2013 | Aspect Software Inc. | Voxeo Corp. |
| May 2013 | Genesys Telecommunications Laboratories Inc. | SoundBite Communications Inc. |
| February 2013 | Genesys Telecommunications Laboratories Inc. | Angel.com Inc. |
| August 2012 | Fair Isaac Corporation | Adeptra Ltd. |
| March 2012 | Avaya Inc. | Radvision Ltd. |
| February 2012 | Shoretel Inc. | M5 Networks Inc. |
| December 2011 | NICE Ltd. | Merced Systems Inc. |
| October 2011 | Permira Advisers Ltd. | Alcatel-Lucent (Genesys) |
| July 2011 | Oracle Corporation | InQuira Inc. |
| March 2011 | USA Mobility Inc. | Amcom Software Inc. |

\*    Represents acquisition of minority stake in Genesys (less than 50% stake was acquired).

Using publicly available estimates and other information for each of the selected precedent transactions, Union Square analyzed the following statistics for each of the selected precedent transactions:

•   The enterprise value of target company divided by revenue for the last 12 months prior to the acquisition date (which we refer to as LTM), which is referred to below as Enterprise Value/LTM Revenue; and

•   The enterprise value of target company divided by estimated revenue for the next 12 months following the acquisition date (which we refer to as NTM), which is referred to below as Enterprise Value/NTM Revenue.

The following table summarizes the mean and median Enterprise Value / Revenue multiples of the selected group of precedent transactions:

| Selected Precedent Transactions Financial Statistic | Mean | Median |
| --- | --- | --- |
| Enterprise Value/LTM Revenue | 3.2x | 3.1x |
| Enterprise Value/NTM Revenue | 2.3x | 2.4x |

Based on the analysis of the relevant metrics and time frame for each selected precedent transaction and upon the application of its professional judgment and experience, Union Square selected representative ranges of implied financial multiples of the selected precedent transactions and applied these ranges of financial multiples to the relevant financial statistic for Interactive Intelligence. The LTM and NTM financial statistics for Interactive Intelligence were defined as the 12 month period ended June 30, 2016 and the 12 month period ending June 30, 2017, respectively.

For purposes of estimated NTM revenue, Union Square utilized the Management Case as well as the Wall Street Case.

The following table summarizes Union Square's analysis:

| Selected Precedent Transactions Financial Statistic | Representative Range | Implied Value Per Share of Interactive Intelligence Common Stock |
| --- | --- | --- |
| Enterprise Value/LTM Revenue | 3.0x - 3.75x | $54.04 - $66.23 |
| Enterprise Value/NTM Revenue (Management Case) | 2.5x - 3.25x | $49.27 - $62.90 |
| Enterprise Value/NTM Revenue (Wall Street Case) | 2.5x - 3.25x | $49.39 - $63.03 |

Union Square noted that the consideration to be received by holders of shares of Interactive Intelligence common stock (other than excluded shares) pursuant to the merger agreement was $60.50 per share.

88.     Lastly, with respect to Union Securities' *Discounted Cash Flow Analysis,* the Proxy fails to disclose: (i) whether this formula produces the same UFCF shown on page 48 of the Proxy in the Forecasts; (a) if so, disclose that it does; (b) if not, explain the differences, why they were necessary/appropriate for Union Securities' analysis, and show Union Securities' projected UFCF figures; (ii) an explanation for why GAAP taxes, and not cash taxes, were used by Union Securities to calculate UFCF; (iii) the assumptions underlying Union Securities' estimate of Interactive Intelligence's WACC, and the quantification and basis for each assumption; and (iv) the implied terminal pricing multiples corresponding to the assumed perpetuity growth rates.

89.     The omission of this information renders the following information misleading:

a.   On pages 55-56 of the Proxy, the following information:

### Discounted Cash Flow Analysis

Union Square calculated a range of prices per share for Interactive Intelligence based on a discounted cash flow analysis to value Interactive Intelligence as a standalone entity. Union Square utilized the Management Case for its analysis. Unlevered free cash flow was derived as Adjusted EBITDA (earnings before interest, taxes, depreciation and amortization and also before stock-based compensation expenses) less stock-based compensation, GAAP taxes (less deferred portion), capital expenditures, capitalized software expenditures and investments in working capital. Union Square calculated the present value of unlevered free cash flow for the calendar years 2016 through 2018 and terminal values in the calendar year 2018 using discount rates, selected upon the application of Union Square's professional judgment and experience, ranging from 9.0% to 11.0%, which were based on a weighted average cost of capital calculation. The terminal value was derived by applying illustrative perpetuity growth rates, selected upon the application of Union Square's professional judgment and experience, ranging from 3.5% to 4.5% to a terminal year estimate of the unlevered free cash flow to be generated by Interactive Intelligence, as reflected in the Management Case.

To derive an implied share price reference range per share of Interactive Intelligence common stock, as compared to the merger consideration of $60.50 per share of Interactive Intelligence common stock, Union Square divided the total implied equity value by the number of Interactive Intelligence fully diluted shares of common stock outstanding. This analysis indicated an implied price per share of $38.52 to $62.68, as compared to the merger consideration of $60.50 per share of Interactive Intelligence common stock.

90.     These statements are rendered false and/or misleading by the omissions identified above for a variety of reasons.  First, the UFCF calculation can impact the valuation resulting from a DCF analysis.  Second, the use of GAAP taxes, and not cash taxes, could have a meaningful impact on the conclusions presented in Union Securities' DCF Analysis.  Third, it is well established that (i) the calculation of a discount rate requires the application of a number of objective inputs and assumptions; and (ii) the ultimate discount rate selected often has the single largest impact on a resulting DCF valuation.  Accordingly, it is important that Interactive Intelligence shareholders be provided insight into the reasonableness of Union Securities' discretionary use of the inputs and assumptions underlying the selected discount rate range.

91.     The Proxy is materially incomplete and misleading because it omits the information identified in ¶¶ 78-89.

92.     These material inputs and assumptions that were used by Union Securities in the financial analyses supporting its fairness opinion presented to the Board are critical to Interactive Intelligence's stockholders' ability to assess the credibility and efficacy of Union Securities' analyses upon which the Board relied in recommending the Proposed Transaction and are necessary to provide stockholders with a fair summary of Union Securities' analyses and work.

93.     For the reasons detailed herein, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

## COUNT I

**(On Behalf of Plaintiff Against Interactive Intelligence and the Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder)**

94.     Plaintiff brings this Exchange Act claim on behalf of themselves individually.

95.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

96.     Defendants have issued the Proxy with the intention of soliciting stockholder support for the Proposed Transaction.  Each of the defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, among other things, the future value of the Company, the key inputs and assumptions of the financial analyses performed by Union Square in support of its fairness opinion, and the background leading up to the Proposed Transaction.

97.     In so doing, defendants made untrue statements of fact and omitted state material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

98.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under

which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

99.     Specifically, and as detailed in ¶¶ 78-89 above, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) the projected financial information prepared by Interactive Intelligence's management and relied upon by Union Square in its financial analyses supporting its fairness opinion; and (ii) key inputs and assumptions underlying Union Square's financial analyses.

100.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.   The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Union Securities reviewed and discussed its financial analyses with the Board during its August 30, 2016 meeting, and further states that the Board considered both the financial analyses provided by Union Securities as well as Union Securities' fairness opinion and the assumptions made and matters considered in connection therewith.   The Individual Defendants knew or should have known that the material information identified in ¶¶ 78-89 above has been omitted from the Proxy, rendering the sections of the Proxy identified in ¶¶ 78-89 above to be materially incomplete and misleading.

101.   The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that defendants' actions threaten to inflict.

## COUNT II

**(On Behalf of Plaintiff Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934)**

102.   Plaintiff brings this Exchange Act claim on behalf of themselves individually.

103.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

104.   The Individual Defendants acted as controlling persons of Interactive Intelligence within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their positions as officers and/or directors of Interactive Intelligence, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

105.   Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

106.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. Projected financial information was reviewed by the Board periodically at meetings. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

107.   In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

108.   By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

109.   As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

110.   Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.   Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B.   Enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company: (i) adopts and implements a procedure or process to obtain a merger agreement providing the best possible terms for the Company's shareholders; and (ii) discloses the material information discussed above which has been omitted from the Registration Statement;

C.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.     Directing defendants to account to Plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

E.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:  October 6, 2016                    Respectfully submitted,

By: */s/  William N. Riley*
William N. Riley (#14941-49)
James A. Piatt (#28320-49)
RILEY WILLIAMS & PIATT, LLC
301 Massachusetts Avenue
Indianapolis, IN  46204
Tel:  317-633-5270
Fax:  317-426-3348
Email:        wriley@rwp-law.com
                    jpiatt@rwp-law.com

Shane T. Rowley
LEVI & KORINSKY LLP
733 Summer Street, Suite 304
Stamford, CT 06901
Tel:  203-992-4523
Fax:  212-363-7171
Email:        srowley@zlk.com

*Attorneys for Plaintiff*